Martin H. Myers (Bar No. 130218)
*mmyers@cov.com*
Christine S. Haskett (Bar No. 188053)
*chaskett@cov.com*
COVINGTON & BURLING LLP
One Front Street
San Francisco, California 94111-5356
Telephone: +1 (415) 591-6000
Fax: +1 (415) 591-6091

Attorneys for Plaintiffs MICRON TECHNOLOGY, INC., MICRON MEMORY TAIWAN CO., LTD., MICRON TECHNOLOGY TAIWAN, INC., MICRON SEMICONDUCTOR ASIA PTE. LTD., and MICRON SEMICONDUCTOR ASIA OPERATIONS PTE. LTD.

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICRON TECHNOLOGY, INC., MICRON MEMORY TAIWAN CO., LTD, MICRON TECHNOLOGY TAIWAN, INC., MICRON SEMICONDUCTOR ASIA PTE. LTD., and MICRON SEMICONDUCTOR ASIA OPERATIONS PTE. LTD., <br><br> Plaintiffs, <br><br> v. <br><br> FACTORY MUTUAL INSURANCE COMPANY, FALVEY CARGO UNDERWRITING, LTD., NAVIGATORS UNDERWRITING AGENCY LIMITED, CHUBB UNDERWRITING AGENCIES LTD., AEGIS LONDON HOLDINGS LTD, ARGENTA SYNDICATE MANAGEMENT LIMITED, CANOPIUS MANAGING AGENTS LIMITED, ARGO MANAGING AGENCY 1200, MS AMLIN PLC, LIBERTY CORPORATE CAPITAL LTD, BEAZLEY GROUP LTD., CATHEDRAL UNDERWRITING LIMITED (UK), AXIS MANAGING AGENCY LIMITED, CHAUCER SYNDICATES LIMITED, ANTARES UNDERWRITING LIMITED, HISCOX INSURANCE COMPANY LTD, ALLIED WORLD ASSURANCE COMPANY HOLDINGS, GmbH, IRONSHORE, INC., and CHINA RE UK LTD., <br><br> Defendants. | Civil Case No.: 3:18-cv-07689 <br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs MICRON TECHNOLOGY, INC. ("MTI"), MICRON MEMORY TAIWAN CO., LTD., ("MMTW"), MICRON TECHNOLOGY TAIWAN, INC. ("MTTW"), MICRON SEMICONDUCTOR ASIA PTE. LTD. ("MSA"), and MICRON SEMICONDUCTOR ASIA OPERATIONS PTE. LTD. ("MSAO") (collectively MTI, MMTW, MTTW, MSA, and MSAO are referred to herein as "Micron"), by their undersigned attorneys, hereby complain and allege against Defendants FACTORY MUTUAL INSURANCE COMPANY ("FM"), FALVEY CARGO UNDERWRITING, LTD. ("Falvey"), NAVIGATORS UNDERWRITING AGENCY LIMITED, CHUBB UNDERWRITING AGENCIES LTD., AEGIS LONDON HOLDINGS LTD, ARGENTA SYNDICATE MANAGEMENT LIMITED, CANOPIUS MANAGING AGENTS LIMITED, ARGO MANAGING AGENCY 1200, MS AMLIN PLC, LIBERTY CORPORATE CAPITAL LTD, BEAZLEY GROUP LTD., CATHEDRAL UNDERWRITING LIMITED (UK), AXIS MANAGING AGENCY LIMITED, CHAUCER SYNDICATES LIMITED, ANTARES UNDERWRITING LIMITED, HISCOX INSURANCE COMPANY LTD, ALLIED WORLD ASSURANCE COMPANY HOLDINGS, GmbH, IRONSHORE, INC., CHINA RE UK LTD. (all collectively "Insurers") as follows:

## **NATURE OF THE ACTION**

1.     This is an insurance coverage action for declaratory judgment, breach of contract, and breach of the implied covenant of good faith and fair dealing.

2.     Plaintiff Micron is an Idaho-based company that is a leading global manufacturer of semiconductor microelectronic devices, including dynamic random-access memory ("DRAM") chips. Plaintiffs MMTW, MTTW, MSA, and MSAO are four of Micron's subsidiaries or affiliates. Defendants FM and Falvey each sold to Plaintiffs insurance policies in effect from June 15, 2017 to June 15, 2018.  All Defendants except FM and Falvey (collectively "Underwriters") are underwriters with interests in and responsibility for the policy sold by Falvey.

3.     The policies that FM sold to Plaintiffs are "all risks" property insurance policies, meaning they insure Plaintiffs' property against "all risks" of loss, as well as provide time element coverage for Plaintiffs' lost income associated with lost or damaged property.  These policies provide insurance coverage to Plaintiffs for losses resulting from an event that occurred in July 2017 at one of Plaintiffs'

semiconductor fabrication facilities located in Taoyuan City, Taiwan, known as the Fab 11 complex, in which certain equipment at Plaintiffs' facility suffered physical loss and damage and thereby caused other equipment and products to be lost and damaged, resulting in significant property damage and time element losses (the "Fab 11 Accident").

4.      Although FM has made advance payments on a portion of Plaintiffs' claims for property damage and time element losses under their policies, FM breached its insurance contracts by refusing to pay the full value of Plaintiffs' losses, including not only Plaintiffs' property damage losses but also Plaintiffs' time element losses, which reflect Plaintiffs' business income/interruption and extended business income losses from the Fab 11 Accident.

5.      The policy that Falvey sold to Plaintiffs, and for which Underwriters also are responsible, is labelled as a "marine/war cargo" insurance policy and covers the value of certain of Plaintiffs' merchandise and goods.  In addition to Plaintiffs' property in transit, the Falvey Policy also provides insurance coverage to Plaintiffs for damage to and losses associated with certain stock in progress, unfinished goods, and raw materials in connection with the Fab 11 Accident.  The Falvey Policy also provides insurance coverage to Plaintiffs for damage to and losses associated with certain stock in progress, unfinished goods, and raw materials in connection with a separate event that occurred in March 2018 at a different of Plaintiffs' semiconductor facilities, located in Taichung City, known as the Fab 16 complex, in which certain equipment at Plaintiffs' facility suffered physical damage and thereby caused other equipment and products to be damaged ("the Fab 16 Accident"), including damages and losses associated with certain stock in progress, unfinished goods, and raw materials covered by the Falvey Policy.

6.      Falvey and Underwriters have breached the Falvey policy by failing to make any payment at all for either the Fab 11 Accident or the Fab 16 Accident.  Falvey and Underwriters have disclaimed coverage entirely as to the Fab 11 Accident by letter, and disclaimed coverage entirely as to the Fab 16 Accident as well, by filing without warning a pre-emptive strike lawsuit against Micron in the United States District Court for the Southern District of New York, captioned *Navigators Underwriting Agency et al. v. Micron Technology, Inc. et al.*, Case No. 1:18-cv-07736-NRB, seeking declaratory judgment that they have no coverage obligations for either Accident.

7.     By this action, Plaintiffs' seek, among other relief: (a) compensatory, consequential, and punitive damages, interest, attorneys' fees, professional fees, and costs from and declaratory relief with respect to all Defendants for their wrongful failure to recognize and satisfy their obligations under the insurance policies to pay Plaintiffs' losses resulting from the Fab 11 Accident, and (b) compensatory, consequential, and punitive damages, interest, attorneys' fees, professional fees, and costs from and declaratory relief with respect to Falvey and Underwriters for their wrongful failure to recognize and satisfy their obligations under the Falvey Policy to pay Plaintiffs' losses resulting from the Fab 16 Accident.

## THE PARTIES

8.     Plaintiff MICRON TECHNOLOGY, INC. is a corporation organized and existing under the laws of the state of Delaware and with its principal place of business in Boise, Idaho.

9.     Plaintiff MICRON MEMORY TAIWAN CO., LTD. is a corporation organized and existing under the laws of Taiwan and with its principal place of business in Taichung City, Taiwan. MMTW is a subsidiary of Micron.

10.     Plaintiff MICRON TECHNOLOGY TAIWAN, INC. is a corporation organized and existing under the laws of Taiwan and with its principal place of business in Taoyuan City, Taiwan. MTTW is a subsidiary of Micron.

11.     Plaintiff MICRON SEMICONDUCTOR ASIA PTE. LTD. is a corporation organized and existing under the laws of Singapore and with its principal place of business in Singapore.  MSA is a subsidiary of Micron.

12.     Plaintiff MICRON SEMICONDUCTOR ASIA OPERATIONS PTE. LTD. is a corporation organized and existing under the laws of Singapore and with its principal place of business in Singapore.  MSAO is a subsidiary of Micron.

13.     On information and belief, Defendant FACTORY MUTUAL INSURANCE COMPANY is a corporation organized and existing under the laws of the state of Rhode Island and with its principal place of business in Johnston, Rhode Island.  FM is licensed to do business in California and, on information and belief, has at times relevant to this Complaint availed itself of the California market by transacting the business of insurance within California by, among other things, negotiating, selling and

placing policies of insurance here, issuing policies to insureds based here and with significant operations here, agreeing to cover risks located here, maintaining an active license as an insurance provider with the California Department of Insurance, adjusting, handling and defending claims here and directing claims communications to insureds here.

14.     On information and belief, Defendant FALVEY CARGO UNDERWRITING, LTD. is a corporation organized and existing under the laws of the state of Rhode Island and with its principal place of business in North Kingstown, Rhode Island.  Falvey is licensed to do business in California and, on information and belief, has at times relevant to this Complaint availed itself of the California market by transacting the business of insurance within California by, among other among other things, negotiating, selling and placing policies of insurance here, issuing policies to insureds based here and with significant operations here, agreeing to cover risks located here, maintaining an active license as an insurance provider with the California Department of Insurance, and adjusting, handling and defending claims here and directing claims communications to insureds here.

15.     On information and belief, Defendant NAVIGATORS UNDERWRITING AGENCY LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at 6 Bevis Marks, Floor 7-8, London, United Kingdom, EC3A 7BA, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

16.     On information and belief, Defendant CHUBB UNDERWRITING AGENCIES, LTD. is an entity organized and existing under the laws of England and Wales, with a principal place of business at 100 Leadenhall Street, London, United Kingdom, EC3A 3BP, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

17.     On information and belief, Defendant AEGIS LONDON HOLDINGS LTD is an entity organized and existing under the laws of England and Wales, with a principal place of business at 33 Gracechurch Street, London, United Kingdom, EC3V 0BT, that at times relevant to the Complaint

transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

18. On information and belief, Defendant ARGENTA SYNDICATE MANAGEMENT LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at 5th Floor, 70 Gracechurch Street, London, United Kingdom, EC3V 0XL, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

19. On information and belief, Defendant CANOPIUS MANAGING AGENTS LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at Gallery 9, One Lime Street, London, United Kingdom EC3M 7HA, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

20. On information and belief, Defendant ARGO MANAGING AGENCY 1200 is an entity organized and existing under the laws of Scotland, with a registered office at Dept 1351, 1st Floor, 211 Dumbarton Road, Mansfield Park, Glasgow, Scotland G11 6AA, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

21. On information and belief, Defendant MS AMLIN PLC is an entity organized and existing under the laws of England and Wales, with a principal place of business at The Leadenhall Building, 122 Leadenhall Street, London, United Kingdom EC3V 4AG, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

22.     On information and belief, Defendant LIBERTY CORPORATE CAPITAL LTD. is an entity organized and existing under the laws of England and Wales, with a principal place of business at 20 Fenchurch Street, London, United Kingdom EC3M 3AW, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

23.     On information and belief, Defendant BEAZLEY GROUP LTD. is an entity organized and existing under the laws of England and Wales, with a principal place of business at Plantation Place South, 60 Great Tower Street, London, United Kingdom EC3R 5AD, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

24.     On information and belief, Defendant CATHEDRAL UNDERWRITING LIMITED (UK) is an entity organized and existing under the laws of England and Wales, with a principal place of business at 20 Fenchurch Street, London, United Kingdom EC3M 3BY, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

25.     On information and belief, Defendant AXIS MANAGING AGENCY LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at 21 Lombard Street, London, United Kingdom EC3V 9AH, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

26.     On information and belief, Defendant CHAUCER SYNDICATES LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at Plantation Place, 30 Fenchurch Street, London, United Kingdom EC3M 3AD, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things,

underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

27.    On information and belief, Defendant ANTARES UNDERWRITING LIMITED is an entity organized and existing under the laws of England and Wales, with a principal place of business at 21 Lime Street, London, United Kingdom, EC3M 7HB, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

28.    On information and belief, Defendant HISCOX INSURANCE COMPANY LTD is an entity organized and existing under the laws of England and Wales, with a principal place of business at 1 Great St Helens, London, United Kingdom EC3A 6HX, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

29.    On information and belief, Defendant ALLIED WORLD ASSURANCE COMPANY HOLDINGS, GMBH is an entity organized and existing under the laws of Switzerland, with a principal place of business at Park Tower, 15th Floor, Gubelstrasse 24, Zug, Zug 6300, Switzerland, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

30.    On information and belief, Defendant IRONSHORE INC. is an entity organized and existing under the laws of the Cayman Islands, with a principal place of business at 141 Front Street, Hamilton HM 19, Bermuda, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

31.    On information and belief, Defendant CHINA RE UK LTD. is an entity organized and existing under the laws of England and Wales, with a place of business at No. 1. Minster Court, London,

United Kingdom EC3R 7AA, that at times relevant to the Complaint transacted the business of insurance in the state of California by, among other things, underwriting policies sold, issued and/or negotiated in California, and responding in California to claims under policies, including doing so by and through its agent Falvey.

32.     On information and belief, all Underwriters do business in the United States, by themselves and/or through agents, affiliates, partnerships, syndicates and other forms of organization unknown to Micron.

## JURISDICTION AND VENUE

33.     The Court has subject matter jurisdiction under 28 U.S.C. § 1332, which establishes diversity jurisdiction in cases where, as here, there is complete diversity between the plaintiff and each defendant and the amount in controversy exceeds $75,000 exclusive of costs, interest, and attorney fees.

34.     The Court has personal jurisdiction over each defendant under C.C.P. § 410.10.  As described below, each Defendant-Insurer negotiated, sold and placed contracts of insurance within the State of California, and has conducted significant claim activity in the State of California with respect to the Fab 11 Accident and/or the Fab 16 Accident as the case may be, and therefore has submitted to the jurisdiction of the courts of California as to any cause of action arising therefrom.  Certain Defendants also have expressly consented to personal jurisdiction in California pursuant to agreements entered into with Plaintiffs.

35.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of Defendant-Insurers' wrongful conduct with respect to Plaintiffs occurred in California.  This includes but is not limited to selling, negotiating and placing the insurance policies at issue here in and through the State of California, and handling, discussing, directing communications regarding and negotiating the claims at issue herein in and through the State of California.

## FACTUAL BACKGROUND

36.     FM and Falvey each sold insurance policies to Micron which were in full force and effect and provided coverage when the Fab 11 Accident took place in July 2017.  Underwriters have interests in and are responsible for the policy sold by Falvey, and for Falvey's actions in handling claims

thereunder on Underwriters' behalf.  These policies provide Micron with insurance coverage for various losses and damages resulting from the Fab 11 Accident, less certain applicable deductibles.

37.     That same policy sold by Falvey, and which Underwriters have interest in and responsibility for, also was in full force and effect when the Fab 16 Accident took place in March 2018. This policy provides Micron with coverage for various losses and damages resulting from the Fab 16 Accident as well, less certain applicable deductibles.

### A.     The FM Policy and Taian Policy

38.     FM sold policy number 1026563 (the "FM Policy"), effective June 15, 2017 to June 15, 2018, to Micron and other Micron-affiliated entities.  The FM Policy is a property insurance policy that provides a maximum of $1,000,000,000 of coverage per occurrence.  A true and correct copy of the FM Policy is attached hereto as Exhibit A.

39.     The FM Policy designates itself as a "Master Global Insuring Policy," requiring the insured to carry a relevant local or "fronting" policy with respect to various jurisdictions outside the United States.

40.     For certain property located in Taiwan, FM also sold to Micron policy number 07-056106A00115, effective June 15, 2017 to June 15, 2018 (the "Taian Policy").  The Taian Policy, too, is a property insurance policy providing a maximum of $1,000,000,000 of coverage per occurrence.  A true and correct copy of the Taian Policy is attached hereto as Exhibit B.

41.     While the Taian Policy was ostensibly issued by Taian Insurance Company Limited ("Taian"), on information and belief, in fact it was issued by or on behalf of FM, and liability Taian might face under the Taian Policy, including amounts payable for any claims under the Taian Policy, is borne and/or reinsured by FM which bears such liability in the United States.  Taian holds itself out and is held out by Defendant FM as a "WorldReach Partner" of FM and part of FM's "broad global network" through which "the combination of [FM's] services—underwriting, claims, engineering [are] delivered."  FM has responded on Taian's behalf to Micron in connection with the claims for the Fab 11 Accident, and at all times FM has acted on Taian's behalf.  On information and belief, at all times relevant to this Complaint, FM has held final decisional authority for Taian with respect to the Fab 11 Accident claim.  On information and belief, FM has assumed Taian's obligations and Micron is an

actual and/or intended beneficiary of such assumption.  On information and belief, FM and Taian have operated in concert and in common purpose with regards to all allegations herein, and functionally served as a single entity at the direction and control of FM with regard to the negotiation and issuance of the FM Policy and Taian Policy, the handling of claims thereunder, and all other underlying events, such that any separation of corporate identity should be disregarded.

42.     Negotiations between Micron, on the one hand, and FM, on the other, regarding the scope, placement, form and terms of the FM Policy and Taian Policy took place in San Francisco, California, and were conducted by and through the offices of the insurance broker Integro and its personnel, all located in San Francisco, California.

43.     The scope, terms and conditions of the coverage provided by the FM Policy and the Taian Policy are essentially identical with regard to Plaintiffs' claims for coverage of Micron's losses from the Fab 11 Accident, though the FM Policy and the Taian Policy allocate payment of certain losses between the two policies, as described below and based on internal corporate accounting practices and/or reinsurance agreements unknown to Micron but which shall be obtained in discovery in this action.  On information and belief, because FM bears liability under both the FM Policy and the Taian Policy for the Fab 11 Accident claims, allocations between FM and Taian do not affect FM's liability to Micron in this action.

44.     Both the FM Policy and the Taian Policy insure Micron property against "ALL RISKS OF PHYSICAL LOSS OR DAMAGE," (capitals original) where located at insured locations and except as specifically excluded.  Included among the insured locations is Plaintiffs' Fab 11 semiconductor fabrication facility in Taiwan.

45.     Both policies also provide coverage for all Micron time element losses caused by physical loss or damage of the type insured by the policies:

> A.     This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:
>
> > 1)     to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

2)    used by the Insured, or for which the Insured has contracted use;

3)    while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; and

4)    during the Periods of Liability described in this section,

provided such loss or damage is not at a contingent time element location. (FM Policy and Taian Policy, Time Element Coverage, 1.)

46.    "TIME ELEMENT" is not a specifically defined term within either policy, but rather a separate coverage defined within the policies. To quantify time element losses claimed, an insured can use the measure of its "Gross Earnings," such that the FM must pay:

the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)    Gross Earnings;

b)     less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

c)    plus all other earnings derived from the operation of the business. (*Id.*, 2.B.1.)

47.    The FM Policy and Taian Policy both define "Gross Earnings" in pertinent part as follows:

for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured. (*Id.*, 2.B.2.)

48.    The measure of loss under the Gross Earnings calculation further provides that:

In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.

[…] There is recovery hereunder to the extent that the Insured is:

a)      wholly or partially prevented from producing goods or continuing business operations or services;

b)      unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

c)      unable to continue such operations or services during the PERIOD OF LIABILITY; and

d)      able to demonstrate a loss of sales for the operations, services or production prevented.  (*Id.*, 2.B.3-4.)

49.     Thus, under the FM Policy and the Taian Policy, Plaintiffs are entitled to recover their Actual Loss Sustained during the "PERIOD OF LIABILITY" (capitals original) following the Fab 11 Accident.  The "PERIOD OF LIABILITY" is defined, for buildings and equipment, as the period "starting from the time of physical loss or damage of the type insured" and "ending when with due diligence and dispatch the building and equipment […] (i) could be repaired or replaced; and (ii) made ready for operations, under the same or equivalent physical and operating conditions that existed prior to the damage."  *Id.*, 3.A.1.

50.     The FM Policy and Taian Policy cover the same losses, but contain provisions allocating payment of certain losses between the two.  In that regard, the FM Policy provides as follows, subject to certain conditions:

This Policy is designated the Master Global Insuring Policy.  Coverage under this Policy shall apply only after the coverage provided under the local policy issued by the Company, its **representative company(ies)** [bolding original] or any other insurance company has been exhausted.  Such local policy will be the first policy to respond in the event of loss or damage. Only upon exhaustion of coverage under the local policy, this Policy covers:

A.      the difference in definitions, perils, conditions or coverages between the local policy and this Policy; and

B.      the difference between the limit(s) of liability stated in the local policy and this Policy (FM Policy, Decl., ¶ 9.)

51.     The Taian Policy, meanwhile, contains a "Master Policy Extension Clause," providing that:

It is agreed that if, during the term of this Policy, a loss happens within the TERRITORY of this Policy and such loss is recoverable under the terms and conditions of master Policy No. 1026563 (hereinafter referred to as Master Policy) [the FM Policy] then the Company shall be liable under this Policy for such loss but only to the extent such loss is recoverable under the Master Policy.  (Taian Policy, Master Policy Extension Clause, 1.)

52.     The FM Policy and Taian Policy thus collectively provide coverage for "ALL RISKS OF PHYSICAL LOSS OR DAMAGE" related to the Fab 11 Accident, and time element losses—including business interruption loss and extended business income losses—resulting from physical loss or damage of the type insured, until such time as the Fab 11 complex could be repaired and returned to full operations consistent with its production prior to the Fab 11 Accident.

## B.    The Falvey Policy

53.     Falvey and Underwriters sold to Micron Falvey Cargo Underwriting policy number MC-2388/WC-2388, effective June 15, 2017 to June 15, 2018 (the "Falvey Policy").  The Falvey Policy provides insurance coverage for "lawful goods and/or merchandise and/or property of every description" of Micron and "its subsidiary, associated, affiliated and interrelated companies, and joint ventures."  It provides up to a maximum limit of $95,000,000 in coverage.  A true and correct copy of the Falvey Policy is attached hereto as Exhibit C.

54.     On information and belief, Falvey and Underwriters at all times negotiated, adjusted, handled, and evaluated the Falvey Policy together and collectively.

55.     Negotiations as between Micron, on the one hand, and Falvey and Underwriters, on the other, regarding the scope, placement and terms of the Falvey Policy took place in San Francisco, California, and were conducted by and through the offices of the insurance broker Integro and its personnel, all located in San Francisco, California.

56.     The Falvey Policy states that interests it insures include:

The interests insured under this policy are (i) lawful goods and/or merchandise and/or property of every description whether new or used, including bulk goods, consisting principally of, but not limited to, computer components, supplies, equipment or similar interests, including raw materials, work in process and/or various stages of manufacture, including salesperson's samples and including prepaid freight, advanced freight, guaranteed freight and freight payable "vessel lost or not lost,"

under or on deck, shipped by or consigned to The Insured, its agents or others, (ii) The Insured's own goods and/or merchandise and/or property, and (iii) goods and/or merchandise and/or property of others in which The Insured may have an interest.  (Falvey Policy, Clause 3.1.)

57.  The Falvey Policy provides various methods for calculating the value of property, including:

10.5  Unfinished goods including raw materials and work in process shall be valued at the Insured's selling price of finished stock at the time of loss, less any manufacturing expenses not incurred by the Insured and less any discounts, rebates and unincurred expenses to which the sales price would have been subject.

10.6  Finished goods shall be valued at the Insured's selling price at date and time of loss less any discounts and/or unincurred expenses.

10.7  Goods not in the ordinary course of transit to be valued as follows:

A.  On stock in process, the value of raw materials and labor expended.

B.  On finished goods manufactured by the Insured, the regular cash selling price, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.  On raw materials, supplies or other merchandise not manufactured by the Insured:

a.  if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

b.  if not repaired or replaced, the actual cash value. (Falvey Policy, Clause 10.)

58.  The Falvey Policy thus provides insurance to Micron for raw materials, "works in process and/or various stages of manufacture," and Micron's own goods, merchandise, and property.  The covered value of such covered goods is to be calculated as described above.

59.  The Falvey policy contains a "Process Clause," the full text of which states:

This Insurance remains in full force while the subject matter insured is under any process, but in no case shall extend to cover any loss or damage thereto solely caused by such process or resulting therefrom.  (Falvey Policy, Clause 71.)

C.     **Micron's Fab 11 and Fab 16 Facilities**

60.     Micron's Taiwan-based semiconductor fabrication operations include the Fab 11 facility in Taoyuan City, Taiwan, which consists of three interconnected buildings (known as Fab 11A, 11B, and 11C) that are involved in the fabrication of 300-mm DRAM semiconductor wafers.

61.     Micron also maintains a second, separate semiconductor fabrication facility in Taichung City, Taiwan, known as Fab 16, which is involved in the production of DRAM wafers using a similar manufacturing and production techniques to the ones employed at Fab 11.

62.     The production of DRAM wafers at both facilities is highly sensitive and requires that manufacturing conditions be kept pristine and that all tools be precisely calibrated to match exactly with numerous detailed specifications.  Even the slightest upset or irregularity in conditions can disrupt production and damage the wafers, materials and tools.

63.     Fabrication of the semiconductor wafers made in both facilities involves hundreds of steps, many of which require the deposition of certain elements or compounds onto the surface of the wafers.  Certain of these steps require the use of a stream of ultra-pure nitrogen, and even the most miniscule presence of other components within that ultra-pure nitrogen stream can cause tremendous damage to the wafers and production tools.

64.     To facilitate these production and fabrication needs, each of the three buildings in the Fab 11 complex maintains dedicated "air separation plants" that are separate from the wafer fabrication activities.  These plants take ambient air, which is naturally composed of approximately 78 percent nitrogen, 21 percent oxygen, and 1 percent other trace gases, and run the air through a cryogenic distillation system that cools the air into a liquid and then distills out its component elements to generate pure nitrogen required for 300-DRAM wafer fabrication.  The air separation plants thereby remove oxygen and other trace gases from the nitrogen stream.

65.     Under normal operating conditions, the air separation plants at Fab 11 compress the ambient air and cool it to a liquid.  This liquid then undergoes distillation in the air separation plant's "cold box," where extremely low temperatures enable the components of the air to be separated.  Part of the distillation in the cold box involves a "low pressure column," which has a liquid level monitored by

a piece of equipment known as a "level transmitter."  Gaseous nitrogen, with almost all of the oxygen removed, passes from the top of this low-pressure column towards the nitrogen distribution system.

66.     Downstream in the nitrogen distribution system, another piece of equipment is located, known as an "oxygen analyzer."  The oxygen analyzer provides a check on oxygen levels in the nitrogen stream.  Should the level of oxygen be too high, the oxygen analyzer is supposed to trip a relay, which closes a valve and halts the flow of gaseous nitrogen, with a diversion to liquid nitrogen supply, thus preventing the oxygen from reaching the sensitive machinery and wafers under fabrication.

67.     Past the oxygen analyzer, the gaseous nitrogen stream then passes through a system of nine "nitrogen purifiers" installed in parallel, which remove remaining trace levels of oxygen from the nitrogen stream to produce ultra-pure nitrogen, which comes in direct contact with wafers and sensitive production equipment or "tools."  By the time the nitrogen exits the purifiers, the oxygen content of the nitrogen gas is essentially zero—below 1 part per billion.  At this stage, the  ultra-pure nitrogen is suitable for use in wafer fabrication and production, and it is permitted to come into direct contact with wafers and production tools.

68.     At Fab 16, unlike at Fab 11, the nitrogen input to fabrication is supplied not by an air separation plant operated by Micron, but by a plant operated by a third party, Air Products.

**D.     The Fab 11 Accident in July 2017 and Plaintiffs' Resulting Losses**

69.     On July 1, 2017, certain equipment in and associated with the Fab 11C air separation plant suffered physical damage and physical loss, which resulted in massive amounts of extraneous oxygen entering the distribution piping and production system of the Fab and causing property damage to and loss of wafers, significant property damage to and loss of Micron's fabrication and production operations and equipment and tools, and significantly diminished production pace and time element losses.

70.     One of the pieces of equipment in the air separation plant that suffered physical injury and damage and was lost was the low-pressure column's level transmitter.  While the column was operating at normal capacity, the damaged transmitter failed and signaled—incorrectly—that the contents of the column had fallen to zero.  The system responded to compensate and, based on information that the column was completely empty, introduced high volumes of liquid into the column.

However, because the column was in fact already at normal operating levels, the column was filled past capacity and overflowed, causing the separation to stop effectively working.  As a result, rather than nitrogen rising up out of the low pressure column, a combined nitrogen/oxygen stream discharged out through the system's distribution piping and toward the production system.

71.     The oxygen-rich stream then encountered the oxygen analyzer, which detected the massive extraneous oxygen levels and was supposed to trip the relay to close the appropriate isolation valve.  The contacts of this relay are normally closed but open, if and only if, higher than permissible levels of oxygen are detected.   The relay trips sending a signal to a three-way isolation valve to stop the flow of off-specification gas and feed vaporized liquid nitrogen into the system.  However, the contacts of this relay were physically damaged and failed to open, such that the valve stayed open, permitting the oxygen-rich gaseous nitrogen stream to pass through.

72.     The nitrogen purifiers downstream of the air separation plant then attempted to remove the oxygen from the stream, as is their function.  Although the purifiers removed the oxygen for a very short time, the oxygen content was so high that the purifiers rapidly overheated and several were physically damaged and lost.  This damage to the purifiers prevented them from removing oxygen from the stream and allowed the off-specification nitrogen stream to exit the purifiers.  The stream—still carrying massively high oxygen levels—reached the wafer production area, where it came into direct contact with a number of production tools and in-progress wafers, causing significant damage to these tools and wafers.

73.     As a result of these events at Fab 11, Micron's production line at Fab 11 sustained significant further physical damage and loss.  Production tools, nitrogen distribution piping, and the damaged nitrogen purifiers had to be repaired and/or replaced due to damage caused by the excess oxygen.  Many in-progress wafers, unfinished goods, and raw materials were damaged.  Due to the physical damage to and loss of the production system and tools, Micron's ability to produce wafers was significantly diminished for a number of weeks while repairs were made and replacement tools and equipment were recalibrated.  This reduced Micron's production pace and caused significant additional losses including time element losses.  These losses are covered under the FM Policy and the Taian Policy.

74.     Additionally, the in-progress wafers, unfinished goods, and raw materials damaged and lost in connection by the Fab 11 Accident are covered under the Falvey Policy.

**E.     The Fab 16 Accident in March 2018 and Resulting Losses Under the Falvey Policy**

75.     On March 19, 2018, a separate and unrelated event began at Fab 16 for which Micron also seeks coverage under the Falvey Policy, for physical damage and injury to raw materials, unfinished goods, and in-progress semiconductor wafers.

76.     On that day, Air Products began conducting regularly scheduled annual preventative maintenance at its Fab 16 air separation facility.  Thereafter, on or around March 20, 2018, an event occurred within the Air Products plant causing damage to equipment and preventing the plant from restarting as planned following the maintenance.

77.     On March 21, 2018, Micron was forced to curtail its operations at Fab 16 due to the loss of nitrogen supply from the Air Products plant.  The Air Products facility remained offline for more than a week, and as a result Micron was not able to return Fab 16 to full production until approximately March 31, 2018.

78.     During the Air Products plant outage, Micron employed various back-up resources to try to compensate for the lost nitrogen, but these resources were insufficient to satisfy Fab 16's production demand.  As a result, Micron suffered significant losses in production related to the event.  Additionally, during the production curtailment, wafers in various stages of manufacture at Fab 16 remained idled in between manufacturing stages, and as a result a number of wafers were lost, damaged, or compromised.

79.     In-progress wafers, unfinished goods, and raw materials damaged and lost in connection by the Fab 16 Accident are covered under the Falvey Policy.

**F.     Breach of the FM and Taian Policies**

80.     As set forth above, the FM Policy and Taian Policy both provide coverage for Micron's losses related to the Fab 11 Accident, including both property damage and time element losses.

81.     Micron timely notified FM of the Fab 11 Accident and tendered the Fab 11 Accident to FM for payment.

82.     Micron thereafter continued to provide FM with significant volumes of additional information concerning Micron's claims for coverage, including considerable technical and factual

information concerning the Fab 11 Accident itself, and extensive financial documentation of Micron's losses arising therefrom.  Micron's efforts to provide the Insurers with information regarding the Fab 11 Accident included multiple in-person meetings in San Francisco, California, and onsite at Micron's production facility in Taoyuan, Taiwan during which Micron presented the claim in extensive detail and discussed technical and factual aspects of the claim and the losses.

83.     Micron paid all required premiums in full and have satisfied all other conditions to coverage, or are otherwise excused from doing so.  All actions taken by Micron with respect to the above losses have been reasonable, have mitigated losses Insurers are required to pay, and no action of or taken by Micron has prejudiced the ability of FM to fulfill its contractual obligations.

84.     However, FM has to date refused to pay the full value of Micron's losses at Fab 11, as it is contractually obligated to do under the terms of the FM Policy and Taian Policy.  Among other things, FM wrongfully has refused to recognize the existence and timing of all of the property damage and loss at, of or involving the level transmitter, the O2 analyzer relay and the nitrogen purifiers at Fab 11, and has taken an incorrect position as to the Period of Liability that determines the scope of their obligations to indemnify Micron for losses from the Fab 11 Accident.

85.     FM has wrongfully rejected Micron's claims for coverage of the Fab 11 Accident under the FM Policy and the Taian Policy.  In contrast to FM's conduct to date with respect to Micron's claims for coverage of the Fab 16 Accident, with respect to the Fab 11 Accident FM has delayed in responding to Micron, unnecessarily dragging this matter out for more than a year.  Had FM conducted a timely, fair, proper, and adequate investigation of Micron's claims regarding Fab 11, it would have agreed to indemnify Micron for the full value of the losses from the Fab 11 Accident.  Further facts and allegations will be developed through discovery in this action and presented at trial of this action.

## G.     Breach of the Falvey Policy

86.     The Falvey Policy provides coverage for Micron's losses related to both the Fab 11 Accident in July 2017 and the Fab 16 Accident in March 2018.  These losses reflect the value of Micron's lost raw materials, "works in process and/or various stages of manufacture," and Micron's own goods, merchandise, and property damaged in connection with the two accidents.

87.     Micron timely notified Falvey and Underwriters of the Fab 11 Accident and Fab 16 Accident, and duly tendered both events to Falvey and Underwriters for coverage and payment under the Falvey Policy.  Micron thereafter continued to provide Falvey and Underwriters with additional information concerning Micron's claims for coverage, including considerable technical information concerning the accidents and extensive financial documentation of Micron's losses arising therefrom.

88.     Falvey and Underwriters have refused to make any payment for Micron's covered losses relating to either the Fab 11 Accident or the Fab 16 Accident.

89.     On November 30, 2017, Micron received an undated letter from and/or on behalf of Falvey and Underwriters, completely denying any coverage under the Falvey Policy for Micron's losses arising from the Fab 11 accident.  Falvey and Underwriters wrongfully took the position that even though the losses were caused by the accidental introduction of massive amounts of oxygen into the wafer fabrication and production, and even though the Falvey Policy "remains in full force while the [wafers are] under any process," that the losses were "solely caused by such process."  They were not. Falvey and Underwriters also wrongfully have taken the position that Section 10.7 of the Valuation Clause applies, when in fact Section 10.5 of the Valuation Clause applies.

90.     Despite this wrongful declination, denial and valuation of the Fab 11 claim, Micron continued to attempt to resolve that claim with Falvey and Underwriters by providing extensive additional information.  Falvey and Underwriters wrongfully refused to consider such information.

91.     In the course of this information exchange, and out of concern that Falvey and Underwriters would bring suit pre-emptively in a New York court to gain a perceived procedural advantage on the Fab 11 claim, Micron informed Falvey on February 22, 2018 that it would bring suit against Falvey on May 14, 2018 if the claim were not satisfactorily resolved before that time.  Micron later sent two letters to Falvey extending this deadline as the parties continued to discuss the claim.

92.     This concern proved justified, as on August 24, 2018, and with discussions still ongoing and without any warning or notice, Underwriters initiated a pre-emptive strike lawsuit against Micron in the United States District Court for the Southern District of New York, *Navigators Underwriting Agency et al. v. Micron Technology, Inc. et al.*, Case No. 1:18-cv-07736-NRB, seeking declaratory judgment

that they had no obligation to indemnify Micron for its losses from the Fab 11 Accident.  Underwriters, however, did not serve Micron for several months while negotiations continued.

93.     Underwriters and Falvey never timely or properly responded to Micron's notification and tender of coverage for losses arising from the Fab 16 accident at all.  Instead, Underwriters responded to the Fab 16 claim only by filing an Amended Complaint in their action against Micron on November 28, 2018, wrongfully asserting without support, explanation or any basis that the Process Clause precludes coverage for the Fab 16 claim as well.  It does not.  Underwriters also wrongfully contend that Section 10.7 of the Valuation Clause applies, when in fact Section 10.5 of the Valuation Clause applies.

94.     Despite this wrongful declination, denial and valuation of both the Fab 11 and the Fab 16 claims, Micron continued to attempt to resolve that claim with Falvey and Underwriters by providing extensive additional information.  Falvey and Underwriters wrongfully refused to consider such information.

## FIRST CLAIM FOR RELIEF

## FOR BREACH OF CONTRACT

## AGAINST FM

95.     Plaintiffs hereby incorporate Paragraphs 1 through 94 above as if fully set forth herein.

96.     The FM Policy and Taian Policy are valid contracts of insurance, binding on the parties.

97.     Plaintiffs have complied fully with all of the terms and conditions of the FM Policy and the Taian Policy, and have fulfilled each obligation on their part to be performed, except those which have been excused and/or waived.

98.     FM has breached contractual duties under the FM Policy and the Taian Policy to indemnify Plaintiffs for and to pay the total and correct value of all of Plaintiffs' losses arising from the Fab 11 Accident and covered by the FM Policy and the Taian Policy.

99.     As a direct and proximate result of FM's breaches of the FM Policy and the Taian Policy, Plaintiffs have been deprived of, and continue to be deprived of, the benefits of the insurance coverage for which Plaintiffs paid all applicable premiums.

100.     As a direct and proximate result of the conduct of FM, Plaintiffs have been injured and damaged in an amount not less than the total value of all property damage and time element losses arising from the Fab 11 Accident, and which will be proved and established at trial.

101.     As a further direct and proximate result of the breaches of contract by FM, Plaintiffs have been forced to incur and will continue to incur additional consequential damages, including, without limitation, attorneys' fees and other expenses in bringing this action, and lost earnings and interest on amounts wrongfully withheld by FM, which damages and interest will be proved and established at trial.

### SECOND CLAIM FOR RELIEF

### FOR DECLARATORY RELIEF

### AGAINST FM

102.     Plaintiffs hereby incorporate Paragraphs 1 through 101 above as if fully set forth herein.

103.     As set forth above, FM sold Plaintiffs the FM and Taian insurance policies covering property damage and time element losses arising from the Fab 11 Accident.

104.     Plaintiffs have satisfied all applicable conditions precedent to coverage under the FM Policy and the Taian Policy.

105.     This is a cause of action for declaratory relief pursuant to 28 U.S.C. § 2201(a).  Plaintiffs seek a judicial determination of their rights and FM's duties with respect to an actual controversy arising under the FM Policy and under the Taian Policy.

106.     Pursuant to the FM Policy and the Taian Policy, FM is obligated to indemnify Plaintiffs for all property and time element losses resulting from the Fab 11 Accident in excess of the applicable deductibles.

107.     The obligations of FM under the FM Policy and the Taian Policy include indemnifying Plaintiffs for "ALL RISKS OF LOSS OR DAMAGE" to property associated with the Fab 11 Accident, and indemnifying Plaintiffs for time element losses for the full time period during which the Fab 11 facility could be, with due diligence and dispatch, repaired or replaced and made ready for operations under the same or equivalent physical and operating conditions that existed prior to the damage.

108.     An actual controversy of a justiciable nature exists between Plaintiffs and FM concerning the proper construction of the FM Policy and the Taian Policy and the rights and obligations of the

parties thereto.   In that regard, on information and belief, FM wrongfully contends that coverage for the Fab 11 Accident is limited and/or barred by certain policy exclusions, that no loss of or damage to property occurred at certain areas of Fab 11 at various times, and that the time at which part of the damage occurred should serve to limit the overall Period of Liability.  FM also, on information and belief, disputes the amount of property damage and time element losses attributable to the Fab 11 Accident and the amount of applicable deductibles.  These controversies are of sufficient immediacy and magnitude to justify declaratory relief.

109.    The issuance of declaratory relief by the Court addressing the obligations of FM under the FM Policy and the Taian Policy will terminate some of the controversy between the parties.

110.    Accordingly, Plaintiffs are entitled to a declaration of the parties' rights and obligations under the FM Policy and Taian Policy and 28 U.S.C. § 2201(a).

## **THIRD CLAIM FOR RELIEF**

### **FOR BREACH OF CONTRACT**

### **AGAINST FALVEY AND UNDERWRITERS**

111.    Plaintiffs hereby incorporate Paragraphs 1 through 110 above as if fully set forth herein.

112.    The Falvey Policy is a valid contract of insurance, binding on the parties.

113.    Plaintiffs have complied fully with all of the terms and conditions of the Falvey Policy, and have fulfilled each obligation on its part to be performed, except those which have been excused and/or waived.

114.    Falvey and Underwriters have breached their contractual duties under the Falvey Policy to indemnify Plaintiffs for and to pay the total and correct value of Plaintiffs' losses arising from the Fab 11 Accident and the Fab 16 Accident.

115.    As a direct and proximate result of Falvey's and Underwriters' conduct, Plaintiffs have been injured and damaged in an amount not less than the total value under the Falvey Policy of the losses arising from the Fab 11 Accident and the Fab 16 Accident, and which will be proved and established at trial.

116.    As a further direct and proximate result of Falvey's and Underwriters' breaches of contract, Plaintiffs have been forced to incur and will continue to incur consequential damages,

including, without limitation, attorneys' fees and other expenses in defending against Insurers' action in the United States District Court for the Southern District of New York and bringing this action, and lost earnings and interest on amounts wrongfully withheld by Falvey and Underwriters, which damages and interest will be proved and established at trial.

## FOURTH CLAIM FOR RELIEF

### FOR DECLARATORY RELIEF

### AGAINST FALVEY AND UNDERWRITERS

117.    Plaintiffs hereby incorporate Paragraphs 1 through 116 above as if fully set forth herein.

118.    The Falvey Policy insures "lawful goods and/or merchandise and/or property of every description whether new or used, including bulk goods, consisting principally of, but not limit to, computer components, supplies, equipment or similar interests, including raw materials, work in process and/or various stages of manufacture[,]" "[t]he Insured's own goods and/or merchandise and/or property[,]" and "goods and/or merchandise and/or property made for the account of others which The Insured agrees or receives instructions to insure[,]" unless otherwise excluded under the policy.

119.    The Fab 11 Accident and the Fab 16 Accident occurred during the policy period of the Falvey Policy, and all property damaged was damaged during the policy period.

120.    Consistent with the above coverage grant, the in-progress wafers, unfinished goods, and raw materials damaged during the Fab 11 Accident and Fab 16 Accident represent covered losses under the Falvey Policy.

121.    The losses arising from the Fab 11 Accident were caused by the accidental introduction of massive amounts of oxygen into the wafer fabrication and production, and were not "solely caused by such process" such that the Process Clause is inapplicable.  The losses arising from the Fab 16 accident were caused by property damage to equipment at the facilities or and operated by Air Products and were not "solely caused by such process" such that the Process Clause is inapplicable.

122.    Accordingly, Plaintiffs request declaratory judgment that losses from the Fab 11 Accident and Fab 16 accident are covered under the Falvey Policy, are not excluded by the Process Clause, and must be paid by Falvey and Underwriters to Plaintiffs from the Falvey Policy.

123.    Plaintiffs further requests a declaratory judgment that the in-progress wafers, unfinished goods, and raw materials damaged in connection with the Fab 11 Accident and Fab 16 Accident are "unfinished goods including raw materials and work in process" within the meaning of Clause 10.5 of the Falvey Policy, and should be valued according to the terms of that provision.

124.    An actual controversy of a justiciable nature exists between Plaintiffs, on one side, and Falvey and Underwriters, on the other, concerning the proper construction of the Falvey Policy and the rights and obligations of the parties thereto.  The controversy is of sufficient immediacy and magnitude to justify declaratory relief.

125.    The issuance of declaratory relief by the Court addressing the obligations of Falvey and Underwriters under the Falvey Policy will terminate some or all of the controversy between the parties.

126.    Accordingly, Plaintiffs are entitled to a declaration of the parties' rights and obligations under the Falvey Policy and 28 U.S.C. § 2201(a).

## FIFTH CLAIM FOR RELIEF

## FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS

127.    Plaintiffs hereby incorporate Paragraphs 1 through 126 above as if fully set forth herein.

128.    Defendant-Insurers at all material times had a duty to act fairly and in good faith toward Plaintiffs in carrying out their duties under the FM Policy, Taian Policy and/or Falvey Policy.  Part of Insurers obligation to act fairly and in good faith toward Plaintiffs is their obligation to promptly and fairly respond to claims and requests of Plaintiffs and to make reasonable, good faith evaluations and decisions concerning such claims and requests.

129.    Insurers have breached the implied covenant of good faith and fair dealing by wrongfully and vexatiously refusing to provide insurance coverage due and owing to Plaintiffs.  In contravention of their duties and obligations, Insurers have, with respect to the Fab 11 Accident, and as to Falvey and Underwriters only, with respect to the Fab 16 Accident, *inter alia*:

a.      refused and declined to fully compensate Plaintiffs for their losses under the FM Policy, Taian Policy and/or Falvey Policy;

b.  decided without any reasonable basis in fact or law, and for their own purposes and to serve their own desires, that various elements of Plaintiffs' claimed losses are not recoverable under the applicable policies;

c.  decided without any reasonable basis in fact or law, and for their own purposes and to serve their own desires, to take unreasonable positions regarding application of aspects of the applicable policies to the Fab 11 Accident and, with respect to Falvey and Underwriters, the Fab 16 Accident;

d.  wrongly construed facts to support their own positions rather than construing the facts in favor of coverage as required by applicable law;

e.  intentionally and willfully refused to respond to requests from Plaintiffs and demands that Insurers timely and properly honor their obligations under the FM Policy, Taian Policy and/or Falvey Policy, including to make payments due and owing;

f.  engaged in a pattern of delay and evasiveness, designed to not pay Plaintiffs for covered costs and expenses while Insurers attempted to find reasons or bases to deny Plaintiffs coverage and to make unreasonable, unnecessary, excessive and intrusive requests for further information where they knew that such information would not alter their positions and would impose significant expense on Plaintiffs;

g.  Falvey and Underwriters filed without warning a pre-emptive strike lawsuit against Micron in the United States District Court for the Southern District of New York, *Navigators Underwriting Agency et al. v. Micron Technology, Inc. et al.*, Case No. 1:18-cv-07736-NRB, that wrongfully disclaimed coverage as to the Fab 11 Accident and the Fab 16 Accident;

h.  all in violation of accepted insurance industry custom, practice and standards, and their duties to Plaintiffs.

130.  Insurers did the things and committed the acts alleged above for the purpose of consciously withholding from Plaintiffs the rights and benefits to which Plaintiffs are entitled under the

FM Policy, Taian Policy and/or Falvey Policy, and without considering the interests of their insureds at least to the same extent as they did their own interests.

131.    Insurers' acts are inconsistent with the reasonable expectations of their insureds, are contrary to established norms, practices and legal requirements related to insurance claims, are contrary to the express terms of the FM Policy, Taian Policy and/or Falvey Policy, and constitute bad faith and a breach of the implied covenant of good faith and fair dealing.

132.    Insurers' conduct is and has been undertaken with a conscious disregard of Plaintiffs' rights as beneficiaries of the FM Policy, Taian Policy and/or Falvey Policy.

133.    In light of information, facts, and relevant law to the contrary, Insurers, by acting as alleged above and as will be proven at trial, consciously disregarded Plaintiffs' rights.  Insurers have forced Plaintiffs to incur substantial financial losses in connection with their claims related to the Fab 11 Accident and/or Fab 16 Accident, and to take action to pursue the insurance coverage to which Plaintiffs rightfully are entitled.  Insurers have established a pattern of wrongly refusing coverage, causing great prejudice and anguish to Plaintiffs and their personnel.  Insurers have ignored Plaintiffs' interests and concerns through oppressive, malicious, and/or fraudulent conduct within the meaning of California Civil Code Section 3294.  Therefore, Plaintiffs are entitled to recover punitive damages from Insurers in an amount sufficient to punish Insurers and deter similar conduct in the future.

134.    Plaintiffs are informed and believe and thereon allege that Insurers' acts were performed, authorized and/or ratified by their officers, directors, and managing agents, and/or with the advance knowledge or conscious disregard of its officers, directors, and managing agents.

135.    As a direct and proximate result of Insurers' breaches and violations, Plaintiffs have suffered and continue to suffer substantial damages, in an amount exceeding the jurisdictional minimum of the Court, and to be determined at trial.  Such damages include, among other things, losses from property damage caused by the Fab 11 Accident, time element losses caused by the Fab 11 Accident, and, with respect to Falvey and Underwriters, losses in connection with the Fab 16 Accident.  Plaintiffs also have incurred and continue to incur significant, recoverable attorneys' fees and costs to obtain the benefits to which they are entitled and which Insurers wrongfully have denied under the FM Policy,

Taian Policy and/or Falvey Policy.  Pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985),

Plaintiffs also are entitled to recover all such attorneys' fees and costs, plus interest.

### PRAYER FOR RELIEF

136.   WHEREFORE, Plaintiffs respectfully request that this Court enter judgment as follows:

a.    compensatory damages sufficient to indemnify Plaintiffs for all covered losses resulting from the Fab 11 Accident and Fab 16 Accident;

b.    special and incidental damages resulting from the Insurers' breaches of contract;

c.    prejudgment interest at the maximum legal rate;

d.    a declaration that the FM Policy, Taian Policy, and Falvey Policy each cover Plaintiffs' losses resulting from the Fab 11 Accident;

e.    a declaration that the Falvey Policy covers Plaintiffs losses resulting from the Fab 16 Accident;

f.    a declaration that, with respect to the Falvey Policy, such losses are not excluded by the Process Clause, and that such losses should be valued under and consistent with Clause 10.5 of the Falvey Policy

g.    reasonable attorneys' fees;

h.    the costs of the proceedings herein;

i.    punitive damages in an amount to be determined at the time of trial; and

j.    such other relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by a jury on all issues in their Complaint.

Dated:  December 21, 2018                          Respectfully submitted,

                                                   COVINGTON & BURLING LLP

                                                   */s/Martin H. Myers*
                                                   Martin H. Myers
                                                   Christine S. Haskett

                                                   *Attorneys for Plaintiffs MICRON TECHNOLOGY,
                                                   INC., MICRON MEMORY TAIWAN CO., LTD.,
                                                   MICRON TECHNOLOGY TAIWAN, INC., MICRON
                                                   SEMICONDUCTOR ASIA PTE. LTD., and
                                                   MICRON SEMICONDUCTOR ASIA OPERATIONS
                                                   PTE. LTD.*